**In re Estate of LaVeglia**

192

*Amanda K. DiChello, for petitioner.*
*Anthony Roberti, for respondent.*

*NANOVIC,* P.J., June 21, 2013— On February 6, 2011, Lawrence A. LaVeglia ("decedent"), age ninety, died, leaving to survive his two sons: Lawrence M. LaVeglia ("Lawrence"), age 60 (D.O.B. 7/06/50), and Michael A. LaVeglia ("Michael"), age 53 (D.O.B. 11/23/57). Michael is the petitioner and Lawrence the respondent in these proceedings. At issue are changes decedent made in October 2009 to the beneficiary designation for three investment accounts he held with Vanguard, effectively removing Michael as a joint equal beneficiary and naming Lawrence as the sole primary beneficiary of these accounts upon his death. In his petition, Michael asserts decedent lacked the necessary testamentary capacity to execute the

change of beneficiary forms, and that the execution of these forms was procured by undue influence.

## PROCEDURAL AND FACTUAL BACKGROUND

At the time of decedent's death, Michael and Lawrence were not speaking to one another — for more than thirty-five years — and were virtual strangers. (N.T. 4/23/12, pp. 27-30, 48). Why is unimportant and was never made clear on the record. What is important is that decedent knew of this breach and, at least until the beneficiary changes which are in dispute, appears to have treated his sons as equals in the distribution of his estate. (N.T. 4/23/12, p.31; N.T. 7/12/12, p.317).

Also important is the discrepancy in the relationships each son separately maintained with their parents, especially during the final five years of decedent's life. Early on, Michael and Lawrence were raised in New York. In 1962 their parents divorced. (N.T. 4/23/12, p.68; N.T. 7/12/12, p.203). Michael was five years old and Lawrence twelve. From that point forward, Michael's mother was his primary caretaker and the parent with whom he remained closest.

Michael's mother and her husband, his stepfather, relocated to North Carolina in the 1980s. Michael moved there in 1995. (N.T. 4/23/12, pp.9, 71). Before Michael left New York, he saw decedent approximately three to four times a year, mostly on holidays. (N.T. 4/23/12, pp.8, 37-38). In the beginning, when Michael moved to North Carolina, he saw decedent approximately once or twice a year and would also be in contact by telephone three

to four times a year. (N.T. 4/23/12, pp.37-39).[1] However, while Michael maintained telephone contact, he last saw decedent sometime in 2004 or 2005, approximately six years before decedent's death. (N.T. 4/23/12, pp.72, 76).

In contrast, Lawrence left his mother's home when he was eighteen years old, in part because of strained relations with his stepfather. Since then, Lawrence's relationship with his mother has been minimal. In fact, for over thirty-five years prior to his father's death, Lawrence did not speak with or visit his mother. (N.T. 4/23/12, pp.49-50).[2]

Shortly after decedent and his wife divorced, decedent moved to Guantanamo Bay in Cuba where he had obtained a civilian job with the Navy overseeing ship repairs. (N.T. 7/12/12, pp.203-04). He worked in Guantanamo Bay for the next sixteen years, rarely returning to New York. (N.T. 4/23/12, pp.69-70). In 1978, decedent retired and moved to Greenport, New York, on Long Island.

---

1. Michael is a commercial truck driver and has resided in either North Carolina or South Carolina for seventeen years. As a driver, Michael spends most of his time on the road and is able to be home only two or three times a month, primarily on weekends. (N.T. 4/23/12, pp.36-37).

2. Coincidentally, Michael and Lawrence's mother died in January 2011, approximately two weeks before their father. She was predeceased by her husband. Michael was the executor of her estate which had a total net value of approximately $100,000.00 and was divided four ways: 25 percent to Michael, 25 percent to Lawrence's son, Jason, and 25 percent to each of her husband's two children. (N.T. 4/23/12, pp.74, 80, 82). Although Lawrence severed contact with his mother, Jason's mother, Lawrence's ex-wife, made sure her son knew and visited his paternal grandmother. (N.T. 4/23/12, pp.80-81).

Before her death, Michael and Lawrence's mother suffered from Alzheimer's disease which required her admission to a nursing home. Michael and his family did what they could to assist his mother in her final years, and Michael made the arrangements for her admission to the nursing home. (N.T. 4/23/12, pp.49-50, 65-66, 73-74). Lawrence did not attend his mother's funeral services.

Although there were difficulties in their relationship earlier, after decedent returned from Guantanamo Bay and was retired, a normal parent-child relationship developed between Lawrence and his father. (N.T. 7/12/12, pp.216-18). By this time in his life, Lawrence had been married and divorced, and had a son, Jason, born in 1974. Lawrence frequently visited his father, often on holidays, and Lawrence and his son would go boating and fishing with decedent.

Until the changes which are the subject of this litigation, decedent treated his sons equally in terms of gifting and his estate planning. In 2001, he transferred title of his home in Greenport to both of his sons and retained a life estate. In March 2007, the home was sold. Decedent received eighty thousand dollars ($80,000.00), and each of his sons approximately one hundred and twenty thousand dollars ($120,000.00). (N.T. 4/23/12, pp.21-22).

On August 3, 2006, decedent executed his last will and testament. (Petitioner exhibit no. 6). Decedent's will names Lawrence as executor, and Michael as successor executor in the event Lawrence was unable to serve in this capacity. Therein, decedent divided his entire estate equally between his sons. That same date, he also executed a durable general power of attorney with Lawrence named as primary agent, and Michael as successor in the event Lawrence was unable or unwilling to serve. (Petitioner exhibit no. 10). At about this same time, in March 2005, decedent, who previously had his investments relatively equally divided between two separate brokerage accounts, with Michael the beneficiary of one and Lawrence the beneficiary of the other, transferred all of his investments to Vanguard, into three existing accounts. (N.T. 7/12/12, p.300; petitioner

exhibit no. 33 (Lawrence's deposition), pp.83-85, 89). The beneficiary designation of these accounts was changed to name both Michael and Lawrence as equal primary beneficiaries of all three Vanguard accounts.[3]

In September of 2006, decedent moved from his home in Greenport to Peconic Landing Assisted Living Facility ("Peconic Landing"), an independent and assisted senior living community, also in Greenport, about a mile from decedent's home. (N.T. 7/12/12, p.232). This move was prompted after decedent was hospitalized at Eastern Long Island Hospital for one week in June 2006 for fever, dehydration and dizziness. During this hospitalization, decedent was diagnosed by Dr. Caroline Gatewood, a board-certified neurologist, with mild dementia, probably of the Alzheimer's type. (Petitioner exhibit no. 30 (Gatewood deposition), p.38). Dr. Gatewood advised Lawrence that decedent should not drive or live alone. (Petitioner exhibit no. 30 (Gatewood deposition), pp.28-29). Thereafter, Lawrence and decedent made arrangements for decedent to stay at Peconic Landing. (N.T. 4/23/12, p.87).

Decedent was at Peconic Landing until March of 2009. During this time, decedent's ability to take medication on his own was called into question. It was also noted that decedent needed assistance using kitchen equipment and would not eat if left alone. Dr. Mel B. Kaplan, who had been decedent's primary care physician since 1988, observed on September 24, 2007, that decedent's hearing, which was already poor, was getting worse, to the point

---

3. This equal division of assets also extended to a life insurance policy decedent maintained on his life with Michael and Lawrence as equal beneficiaries. (N.T. 4/23/12, p.90).

where decedent needed to read lips. (Petitioner exhibit no. 31 (Kaplan deposition), p.20).

While decedent was at Peconic Landing, Dr. Kaplan became concerned that decedent was showing signs of dementia, cognitive impairment. This decline in decedent's cognitive functioning, which was slow at first, accelerated in 2007 and 2008. (Petitioner exhibit no. 31 (Kaplan deposition), pp.75-76). In consequence, decedent's level of care at Peconic Landing was increased in October 2008 from independent living to assisted living. (Petitioner exhibit No. 31 (Kaplan deposition), pp.56-61; petitioner exhibit no. 30 (Gatewood deposition), pp.48-49). As of December 2008, Dr. Kaplan estimated decedent's level of dementia on a scale of zero to ten, with ten being end-stage dementia, at six or seven. (Petitioner exhibit no. 31 (Kaplan deposition), p.70).

At the time of decedent's admission to Peconic Landing, Lawrence was living in Boston, Massachusetts. In June 2007, he retired and moved to Albrightsville, Carbon County, Pennsylvania. Lawrence and his son regularly visited decedent at Peconic Landing, and Lawrence accompanied his father to doctor visits. (N.T. 7/12/12, pp.167, 237, 241-42). Michael never visited decedent at Peconic Landing, although he did telephone every three to four months. (N.T. 4/23/12, pp.23, 72).

In December 2008 decedent suggested he move to Pennsylvania to be closer to Lawrence and his son, Jason. (N.T. 7/12/12, pp.242, 244-45, 250). This move occurred on March 16, 2009, when decedent was admitted to Sacred Heart Senior Living by Saucon Creek ("Sacred Heart") in Center Valley, Lehigh County, Pennsylvania. Lawrence

selected and made arrangements for decedent's admission to this facility. Michael was not made aware of the move beforehand and did not learn that if decedent had moved until June 2009, when he attempted to reach decedent by telephone at Peconic Landing. (N.T. 4/23/12, pp.24-26). That same month, Michael also received a letter from decedent advising him of decedent's new address and telephone number. (N.T. 4/23/12, p.31; petitioner exhibit no. 5).

On the date of decedent's physical admission to Sacred Heart, he was accompanied by Lawrence. The two met with Tatiana Gula, Sacred Heart's director of admissions, who performed an initial assessment to ascertain decedent's needs and his suitability for independent living, versus assisted living or a nursing home. As part of this assessment, Ms. Gula sought to determine whether decedent could independently perform the activities of daily living (ADL's), or required assistance. Lawrence had asked that decedent be placed in independent living.

During her assessment, Ms. Gula purposely directed her questions to decedent as part of the evaluation process. Decedent was confused and unable to answer. (N.T. 4/23/12, pp.114-15). Instead, Lawrence provided the information requested regarding decedent's medical history, his current medications, and his financial status. (N.T. 4/23/12, pp.113-15). While completing a resident fact sheet, Lawrence asked to be and was designated as the "responsible party" and emergency contact for decedent. (N.T. 4/23/12, pp.125-26).

As a result of her assessment, Ms. Gula concluded that decedent was not able to independently care for himself

and required assisted living. Consequently, Ms. Gula admitted Decedent to the assisted living quarters at Sacred Heart. (N.T. 4/23/12, pp.119-21). Within three days of this admission, at Lawrence's prodding and based, in part, on an evaluation completed by Dr. John R. Manzella, who determined that decedent was suitable for independent living with in-home supports, decedent was moved to independent living. (Petitioner exhibit no. 17).[4]

Between March 16, 2009 and his death on February 6, 2011, decedent was a resident at Sacred Heart. During this time he was visited often by Lawrence, who continued to accompany decedent to medical appointments and provide assistance. (N.T. 7/12/12, p.268; petitioner exhibit no. 33 (Lawrence's deposition), pp.15-16). As with decedent's stay at Peconic Landing, Michael telephoned but did not personally visit decedent. Decedent was observed by staff

---

4. Ms. Gula testified that as a licensed facility, the Pennsylvania Department of Public Welfare requires a completed form MA55 (see 55 Pa.Code §2600.141) before a resident is admitted. This form, completed by a doctor, certifies whether the resident is suitable for independent living, or requires assisted living or skilled nursing care. (N.T. 4/23/12, pp.109-10). On March 16, 2009, a completed MA55 was not provided, however, Lawrence did provide the New York equivalent which state law allowed Ms. Gula to accept on a thirty-day interim basis, provided a completed MA55 was received within thirty days of admission. (N.T. 4/23/12, p.112). This is the form which Dr. Manzella completed. (N.T. 4/23/12, p.165).

Ms. Gula further testified that the New York medical form she was provided disclosed a diagnosis of dementia and that decedent required weekly injections of Procrit for anemia and overall weakness. (N.T. 4/23/12, pp.101, 118-19, 168). For reasons which were unexplained, the New York form Ms. Gula was provided on the date of decedent's admission was removed from decedent's file at Sacred Heart and is not part of the Sacred Heart records which petitioner moved into evidence. Also unexplained was the appearance in decedent's Sacred Heart file of the MA55 form completed by Dr. Manzella and which is dated January 19, 2009, almost two months prior to decedent's admission to Sacred Heart. This form was not previously seen by Ms. Gula and was not provided to her at the time of decedent's admission.

to be mentally alert and able to act on his own. This is not to say that decedent did not show signs of aging or of cognitive decline. He did.

In May of 2009, decedent was admitted to the Lehigh Valley Hospital for dizziness and weakness. An MRI scan of his brain revealed that decedent had experienced a number of transient ischemic attacks, commonly described as "mini strokes." On November 10, 2009, decedent was taken to the hospital after experiencing difficulty rousing from sleep and appearing confused.

On November 13, 2009, decedent fell while in his room at Sacred Heart and fractured his hip. He was hospitalized at Lehigh Valley Hospital and later admitted to the Sacred Heart transitional center for physical therapy where he remained until December 7, 2009. During an exam at the hospital on November 14, 2009, decedent displayed "slow mentation." (N.T. 7/10/12, p.52; N.T. 7/12/12, p.129). Upon discharge he returned to Sacred Heart.

In December 2010, decedent again fell and fractured his hip. Also on January 21, 2011. On January 30, 2011, he was hospitalized for an acute myocardial infarction. On February 4, 2011, he was discharged and returned to Sacred Heart. On February 6, 2011, he died at age ninety. Decedent's certificate of death listed his immediate cause of death as myocardial infarction, with failure to thrive and end stage dementia as underlying causes. (Petitioner exhibit no. 1).

On or about October 1, 2009, decedent executed a Transfer on Death (TOD) Plan Form to change the beneficiary designation of his accounts with Vanguard. (Petitioner exhibit no. 7). On this form, decedent designated

Lawrence as the sole primary beneficiary and Michael as contingent beneficiary of his Vanguard accounts. The form was incorrectly dated July 13, 1920, decedent's date of birth.

On October 2, 2009, decedent signed a second TOD Plan Form again designating Lawrence as the sole primary beneficiary of his Vanguard accounts, but this time listing Lawrence's son, Jason LaVeglia, as the contingent beneficiary. (Petitioner Exhibit No. 8). The effect of these changes was to completely remove Michael as a beneficiary of decedent's Vanguard accounts. No further beneficiary changes were made to these accounts prior to decedent's death.

At the time of decedent's death, the value of his Vanguard accounts was two million three hundred fifteen thousand three hundred sixty-two dollars and forty-eight cents ($2,315,362.48). This figure represents the overwhelming majority of the date of death value of decedent's assets. The value of his probate estate was less than ten thousand dollars ($10,000.00).

It is unknown from whom decedent received the TOD forms or whether anyone assisted him in making the changes described. The forms were available both on-line and by making a telephone request. (N.T. 7/12/12, pp.286-87). Since decedent was not computer literate and required assistance to access his Vanguard accounts on-line, it appears unlikely that decedent obtained the forms on-line — at least without assistance. (N.T. 7/12/12, p.301). Though Lawrence admitted to helping decedent access his accounts on-line on other occasions and to being familiar with the balance in these accounts, he denied obtaining the

forms for decedent, asking decedent to make the changes, assisting decedent in completing the forms, or even being aware before July 2010 of the beneficiary changes made by decedent. (N.T. 7/12/12, pp.279-80, 300-01, 325). Michael did not become aware of the changes until after decedent's death. (N.T. 4/23/12, pp.52-53).

## DISCUSSION

In these proceedings, Michael seeks to void the beneficiary designations made by decedent in October 2009 on two grounds, lack of capacity and undue influence. Each is discussed below.

### 1. Capacity

In *In re Estate of Angle*, the Court stated:

The test for determining the existence of testamentary capacity, a quality every person sui juris is presumed to possess, is whether a man or woman has an intelligent knowledge regarding the natural objects of his bounty, the general composition of his estate, and what he desires done with it, even though his memory may have been impaired by age or disease. In re Brantlinger's Estate, 418 Pa. 236, 247, 210 A.2d 246, 252 (1965).

777 A.2d 114, 125 (Pa. Super. 2001) (quotation marks omitted) (quoting *In re Estate of Ziel*, 359 A.2d 728, 731 (Pa. 1976)). The effect of this presumption is to place on the party challenging a testamentary disposition, here a change of beneficiary designation, the burden of proving the grantor's incapacity.[5]

---

5. In analyzing these claims, a payable on death provision on an investment account is testamentary in nature and analyzed under the same standards which apply to a will contest. *See e.g. Fulkroad v.*

This is not an easy task.

> Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property.

*Estate of Bosley*, 26 A.3d 1104, 1112 (Pa.Super. 2011) (citing *Estate of Hastings*, 387 A.2d 865, 868 (Pa. 1978)). Further,

> [o]ld age, sickness, distress or debility of body neither prove nor raise a presumption of incapacity. Nor will inability to transact business, physical weakness or peculiar beliefs and opinions. Failure of memory does not prove incapacity unless it is total and so extended as to make incapacity practically certain. A testator may not be able at all times to recollect the names of persons or families of those with whom he has been intimately acquainted. He may ask idle questions and repeat himself, and yet his understanding of the ordinary transactions of his life may be sound. He may not have the strength and vigor of a man able to digest all the parts of a contract, yet he may be competent to distribute his property by will.

*Estate of Marie Lista*, 2006 WL 321189 at *14 (Phila.C.P. 2006) (quoting *Lawrence Estate*, 132 A. 786, 789 (Pa. 1926)). Equally important, the evidence of incapacity must

---

*Ofak*, 463 A.2d 1155, 1157 (Pa. Super. 1983) (equating the capacity to designate a beneficiary on a life insurance policy with the requirements for testamentary capacity); *Life Insurance Company of North America v. O'Brien*, 3 Phila.Co.Rptr. 529 (1980) (adopting the same burden shifting standards applied in evaluating the validity of testamentary transfers to a change in beneficiary designation made by the owner of a life insurance policy less than two months prior to death).

be clear, strong and compelling. *In re Kuzma's Estate*, 408 A.2d 1369, 1371 (Pa. 1979).

"Testamentary capacity is to be ascertained as of the date of execution of the contested document." *Estate of Bosley,* 26 A.3d at 1112 (Pa.Super. 2011). Hence, the critical dates before us are those on which decedent executed the transfer on death forms: on or about October 1, 2009 and October 2, 2009. As to the execution itself, there is no evidence of a witness being present nor any evidence of decedent ever being questioned about why the changes were made or his understanding of the effect of the changes. While it is clear decedent was eighty-nine-years-old at the time, was unable to perform unassisted all of the activities of daily living, experienced memory lapses, and exhibited other characteristics of old age and declining mental health, such as a change in gait, inattentiveness to eating accompanied by weight loss, difficulty keeping track of medications, slow mentation, and times of confusion and disorientation, these marks of an impaired intellect are insufficient in and of themselves to take away from decedent the basic right of an individual to dispose of his property, as he chooses. In reaching this conclusion, while we believe decedent's mental abilities were reduced, we also believe decedent's basic understanding of his family, his property, and his wishes respecting the two were intact when he last changed the beneficiary to his Vanguard accounts.

Decedent was admitted to the Eastern Long Island Hospital on June 19, 2006 because of weakness, dizziness, and fever. (Petitioner exhibit no. 31 (Kaplan deposition), pp.25-26). He was discharged on June 26, 2006. CAT scans of his brain taken on June 20, 2006 detected multiple

lacunar infarcts — small strokes to the brain — a common finding associated with individuals who have dementia. (N.T. 7/10/12, p.42). These results evidenced progressive brain atrophy from an earlier MRI taken on November 21, 2003, and which showed early or mild atrophy of the cortex — the outer layer of the brain. (Petitioner exhibit no. 30 (Gatewood deposition), pp.16-17, 27; petitioner exhibit no. 31 (Kaplan deposition), pp.89-90; N.T. 7/10/12, p.34, 42-43).

Dr. Caroline Gatewood, a board-certified neurologist, who previously evaluated decedent in 2003, examined decedent in the hospital on June 21, 2006, followed by two office visits on July 11, 2006 and August 31, 2006. She noted a marked decline in decedent's cognitive functions between 2003 and 2006: he exhibited slow mentation, had an unsteady gait, and evinced memory deficits. (Petitioner exhibit no. 30 (Gatewood deposition), pp.26-27, 35). He also evinced aphasia — a reduction in vocabulary and expressive language — a cardinal symptom of Alzheimer's. (Petitioner exhibit no. 30 (Gatewood deposition), p.41; N.T. 7/10/12, pp.171-72). From the results of her evaluation, and review of the 2006 CAT scan, Dr. Gatewood concluded decedent had mild dementia, probably of the Alzheimer's type. (Petitioner exhibit no. 30 (Gatewood deposition), p.38).[6]

6. Dementia is a loss of cognitive function which manifests itself in deficits in memory, language, problem-solving abilities, insight and judgment. (N.T. 7/10/12, p.34). A generic finding of dementia alone does not reveal the cause of the dementia. Here, Dr. Gatewood diagnosed the probable cause of decedent's dementia as Alzheimer's disease. This form of dementia is progressive and incurable. (Petitioner exhibit no. 30 (Gatewood deposition), p.37; N.T. 7/10/12, pp.38, 120; N.T. 7/12/12 p.15). As testified to by Dr. Rovner, dementia of the Alzheimer's type is termed probable because actual confirmation can only be made by brain biopsy or upon autopsy. (N.T. 7/10/12, pp.140-42). There was no

Dr. Gatewood recommended decedent not live alone, and that he should either receive home care or reside in an assisted living facility. (Petitioner exhibit no. 30 (Gatewood deposition), pp.28-29). This opinion served as the basis for decedent's move to Peconic Landing. Namenda, a medication to slow the progression of dementia, was prescribed. (Petitioner exhibit no. 30 (Gatewood deposition), p.40; Petitioner exhibit no. 31 (Kaplan deposition), pp.30-31).

Dr. Gatewood's diagnosis is supported by the evidence available then, as well as by subsequent events. (N.T. 7/10/12, pp.39-40). Decedent's medical records and the evidence presented at trial is replete with examples of decedent's declining cognitive abilities. Dr. Mel B. Kaplan was decedent's primary care physician for more than twenty years — between 1988 and 2008. (Petitioner exhibit no. 31 (Kaplan deposition) pp.13-14, 19). Between 2006, when decedent was first diagnosed with dementia, and December 5, 2008, decedent's last visit with Dr. Kaplan, Dr. Kaplan noted and documented decedent's worsening memory: his inability to recall why he was present for appointments, not knowing what medications he was taking or when to take them, and loss of weight and malnutrition, frequently caused because of lack of

---

autopsy in this case. (N.T. 7/12/12, p.154).

At both the July 11, 2006 and August 31, 2006 office visits, Dr. Gatewood administered a mini-mental status examination. (Petitioner exhibit no. 30 (Gatewood deposition), pp.41, 48). The mini-mental status examination is a screening test for dementia. It assesses cognitive functions through a series of thirty questions. (N.T. 7/10/12, pp.40-41). decedent scored 25 out of 30 in the first examination and 28 out of 30 in the second. (Petitioner exhibit no. 30 (Gatewood deposition), pp.41, 48). Dr. Gatewood opined this was consistent with her diagnosis of mild dementia. (Petitioner exhibit No. 30 (Gatewood deposition), p.41).

attention to good eating habits. (Petitioner exhibit no. 31 (Kaplan deposition), pp.35, 37-39, 48-51, 54-57, 58-59, 61, 63-65, 67, 70, 74-76, 103).

In telephone conversations decedent had with Michael in June and September 2009, decedent did not recall that Michael had a back operation in 2008, notwithstanding this was a frequent topic of conversation between them in the past. (N.T. 4/23/12, pp.23-40). Tatiana Gula noted decedent's inability to provide background information upon his admission to Sacred Heart, his need for assistance with personal care, his dependence and reliance upon Lawrence, and, on at least one occasion, his inability to distinguish the door to his room from eight others surrounding a central parlor area. (N.T. 4/23/12, pp.127, 139-40, 146).[7] At medical appointments to which Decedent was taken by Lawrence, the providers frequently looked to Lawrence to provide requested information, rather than to decedent. (N.T. 7/10/12, pp. 50-51, 143). In addition, Dr. Barry Rovner, Michael's medical expert,[8] testified that people who suffer from cognitive dysfunction or cognitive disabilities are prone to falling and losing their balance because of problems with perception and being unable to overcome obstacles they encounter. (N.T. 7/10/12, pp.56-57, 59-60). In November 2009, decedent fell and fractured his hip and did so again in December 2010. Decedent fell once more on January 21, 2011, prior

7. Ms. Gula's observations of decedent occurred between March 16, 2009, decedent's date of admission to Sacred Heart, and August 23, 2009, the last day Ms. Gula was employed at Sacred Heart. (N.T. 4/23/12, p.94).

8. Dr. Rovner, who is board-certified in neurology, is a professor in the Department of Psychiatry and Neurology at Thomas Jefferson Hospital in Philadelphia. He is an expert in the field of dementia, memory loss and Alzheimer's disease. (N.T. 7/10/12, p.22).

to his final hospital admission.

Notwithstanding this evidence of weakened intellect, we are not convinced that decedent did not possess testamentary capacity when the beneficiary changes were made. As of July 2006 and December 2008, both Drs. Gatewood and Kaplan respectively agreed decedent knew who his children were and was aware of his investment holdings. (Petitioner exhibit no. 30 (Gatewood deposition), pp.53-54; petitioner exhibit no. 31 (Kaplan deposition), pp. 95-96). In July 2008, decedent gave informed consent to cataract surgery. (Petitioner exhibit no. 31 (Kaplan deposition), p.55; N.T. 7/10/12, pp.83-84).

Three months after moving to Sacred Heart, on June 22, 2009, decedent wrote to Michael and provided the address and telephone number at which he could be reached. (Petitioner exhibit no. 5). In August 2009, less than two months before the Vanguard forms were signed, decedent and Lawrence visited Jason LaVeglia at his new home in Yardley, Pennsylvania. Jason testified decedent was coherent and his normal self. (N.T. 7/12/12, pp.173-75). Finally, while decedent was a resident at Sacred Heart, he kept track of his stocks and taught staff how to manage their finances. (N.T. 7/11/12, pp.167-68).

Decedent was examined three times by Dr. John R. Manzella, a primary care physician board-certified in internal medicine and pediatrics, and board eligible in hospice and palliative care. Dr. Manzella first examined decedent on January 19, 2009, prior to decedent's admission to Sacred Heart. In this examination, Dr. Manzella assessed decedent's mental status and found him to be very sharp. (N.T. 7/11/12, pp.23-25, 62). This

exam was outside the presence of Lawrence. It was at this time that Dr. Manzella completed a DPW form assessing decedent's physical and mental status, and found him capable of independent living. (N.T. 7/11/12, pp.72-74).

In two subsequent examinations, on May 21, 2009 and October 8, 2009, Dr. Manzella noticed no cognitive problems nor any changes from his initial examination. (N.T. 7/11/12, pp.27-32). With respect to the examination on October 8, 2009, several days after the beneficiary changes, Dr. Manzella opined that on that date Decedent was capable of understanding that he had two sons, was capable of understanding the assets he owned, and was capable of making decisions about his health care. (N.T. 7/11/12, pp.34-35). Dr. Anthony Giampolo, Lawrence's medical expert,[9] opined that decedent knew the nature of his assets and the objects of his bounty in October 2009 when the beneficiary forms were signed. (N.T. 7/12/12, pp.68-69).

Joseph Eckstein, a family practice nurse practitioner, saw decedent seven times between June 23, 2009 and March 24, 2010. (N.T. 7/11/12, p.104). At all times, and in particular at his examination on September 17, 2009, the one closest in time to when the beneficiary changes were made, Mr. Eckstein found decedent to be of sound mind, coherent, and lucid. (N.T. 7/11/12, p.108). Mr. Eckstein never noticed any hemiparesis or speech problems, memory loss or red flags for dementia. (N.T. 7/11/12, pp.111, 118, 129).

---

9. Dr. Giampolo is a board-certified neurologist in private practice, active in teaching and lecturing medical students and residents. (N.T. 7/12/12, p.4).

Most telling is the beneficiary forms themselves. In completing these forms, decedent was able to properly follow the instructions and complete the appropriate sections for making a change of beneficiary, to correctly state the ten-digit money market settlement account number needed for making the changes, and to provide his own social security number, as well as the birth dates of his two sons and grandson.

As a legal standard, testamentary incapacity represents a greater level of impairment than weakened intellect. *Estate of Angle*, 777 A.2d at 123 (noting that weakened intellect does not rise to the level of testamentary incapacity). That is, people with a weakened intellect may well retain testamentary capacity. (N.T. 7/10/12, p.74; N.T. 7/12/12, p.63). A determination that decedent lacked the testamentary capacity in October 2009 to make beneficiary changes requires proof that is so strong as to enable us to determine without hesitancy that decedent did not know the objects of his bounty, the general composition of his estate, and what he desired done with it. The evidence does not meet this Standard.

*2. Undue Influence*

Upon proof of proper execution of the change of beneficiary forms by decedent, a presumption of lack of undue influence arose, placing the burden of rebutting this presumption with evidence to the contrary upon the contestant. *Life Insurance Company of North America v. O'Brien,* 3 Phila.Co.Rptr. 529, 533 (1980); *cf. In Re Thompson's Estate,* 126 A.2d 740, 744 (Pa. 1956) (discussing the same with respect to a properly executed will). "[T]he effect is that the risk of non-persuasion and

the burden of coming forward with evidence of undue influence shift to the contestant." *In Re Clark's Estate*, 334 A.2d 628, 631 (Pa. 1975).

In describing what is meant by undue influence, the Supreme Court stated:

> The term "influence" does not encompass every line of conduct capable of convincing a self-directing person to dispose of property in one's favor. *In re Estate of Ziel*, 467 Pa. 531, 359 A.2d 728 (1976). The law requires that the influence be control "acquired over another that virtually destroys [that person's] free agency." *Id.*, 467 Pa. at 540, 359 A.2d at 733. Conduct constituting influence must consist of "imprisonment of the body or mind, fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will." *Id.* A parent-child relationship does not establish the existence of a confidential relationship nor does the fact that the proponent has a power of attorney where the decedent wanted the proponent to act as attorney-in-fact. *In re Estate of Jakiella, supra.*

*Estate of Angle*, 777 A.2d at 123.

Undue influence, "may be, and often can only be" proven by circumstantial evidence. *Estate of Ziel*, 359 A.2d 728, 734 (Pa. 1976).

> "[U]ndue influence is a 'subtle,' 'intangible' and 'illusive' thing," *In re Estate of Clark*, 461 Pa. 52, 334 A.2d 628, 635 (1975), "generally accomplished by a

gradual, progressive inculcation of a receptive mind," *id.* at 634. Consequently, its manifestation "may not appear until long after the weakened intellect has been played upon." *Id.* Because the occurrence of undue influence is so often obscured by both circumstance and design, our courts have recognized that its existence is best measured by its ultimate effect. Thus, the courts' holdings establish a presumption of undue influence when the evidence demonstrates: (1) that a person or persons in a confidential relationship with a testator or grantor has (2) received a substantial portion of the grantor's property, and (3) that the grantor suffers from a weakened intellect. See *id.* at 632; see also *In re Estate of Glover*, 447 Pa. Super. 509, 669 A.2d 1011, 1015 (1996). Once the presumption has attached, the burden of proof shifts to the defendant to disprove undue influence by clear and convincing evidence that one of the foregoing criteria is not established. *See Clark*, 334 A.2d at 632; *Glover*, 669 A.2d at 1015.

*Owens v. Mazzei*, 847 A.2d 700, 706 (Pa. Super. 2004).

Further, whereas testamentary capacity focuses on a grantor's state of mind at the time the document in question was executed, undue influence takes into account the effects of conduct on a weakened intellect over time. On this point, our Supreme Court stated:

[W]here testamentary capacity is at issue, the real question is the condition of the testator at the very time he executed the will, and, although evidence as to capacity which is reasonably distant from the time of execution is admissible as indicative of capacity on the particular day, testimony as to testatrix's condition

close to that time must be considered more significant. *Brantlinger Will*, 418 Pa. 236, 248, 210 A.2d 246, 253 (1965); *Lanning Will*, 414 Pa. 313, 317, 200 A.2d 392 (1964). However sound that rule is, it cannot be imposed upon the law of undue influence. As we said before, weakened mentality as relevant to undue influence need not amount to testamentary incapacity. Undue influence is generally accomplished by a gradual, progressive inculcation of a receptive mind. The 'fruits' of the undue influence may not appear until long after the weakened intellect has been played upon. In other words, the particular mental condition of the testatrix on the date she executed the will is not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity. More credence and weight may be given to the contestant's remote medical testimony.

*Estate of Clark*, 334 A.2d at 634. We next examine in greater detail each of the elements required for a prima facie showing of undue influence.

(a) Confidential Relationship

There is no specific formula by which to define a confidential relationship.

Our Supreme Court has acknowledged that "[t]he concept of a confidential relationship cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line." *In re Estate of Scott*, 455 Pa. 429, 316 A.2d 883, 885 (1974). The court has recognized, nonetheless, that "[t]he essence of such a relationship is trust and reliance on one side, and a corresponding opportunity to abuse that

trust for personal gain on the other." *Id.*

*Owens,* 847 A.2d at 709.

"[It] is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power."

*In Re Estate of Fritts,* 906 A.2d 601, 608 (Pa. Super. 2006), *appeal denied,* 916 A.2d 1103 (Pa. 2007).

A confidential relationship exists "…as a matter of fact whenever one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other."

*In Re Clark's Estate,* 359 A.2d 777, 781 (Pa. 1976). Either an overmastering influence or weakness, dependence or trust, justifiably reposed, will support a confidential relationship, because, in either, the situation is ripe for unfair advantage. *In re Estate of Button,* 328 A.2d 480, 483 (Pa. 1974).

Whether a confidential relationship exits depends on the facts; it is not presumed; and it must be proven.

The burden is initially on the party seeking to set aside a transaction to prove that a confidential relationship existed between the parties. *Thomas v. Seaman,* 451 Pa. 347, 304 A.2d 134 (1973). "[W]here undue influence and incompetency do not appear and the relationship between the parties is not one ordinarily known as confidential in law, the evidence to sustain

a confidential relationship must be certain, it cannot arise from suspicion or from infrequent or unrelated acts." *Weir, supra* 556 A.2d at 825. If it is established that a confidential relationship existed at the time the alleged gift was made, the burden shifts to the donee to show that the alleged gift was free of any taint of undue influence or deception. *Id.*; *Banko, supra*.

*Hera v. McCormick*, 625 A.2d 682, 690 (Pa.Super. 1993).

Each relationship must [] be analyzed on a fact by fact basis. Pennsylvania courts have observed, for instance, that a confidential relationship is not established merely because a proponent performs business services for a testator. Nor is a confidential relationship established merely because a proponent draws checks or pays the testator's bills. *Brantlinger Will*, 418 Pa. at 250, 210 A.2d at 254. On the other hand, a business relation may be the basis of a confidential relationship "if one party surrenders substantial control over some portion of his affairs to the other." *Estate of Scott*, 455 Pa. at 433, 210 A.2d at 886.

*Estate of Marie Lista*, 2006 WL 321189 at *9.

In *Scott*, the decedent, although physically infirm, had retained sufficient mental capacity to direct her own affairs and had continued to do so in substantial measure, employing others merely to act at her direction. *See* 316 A.2d at 886. The court recognized accordingly that the evidence provided no basis on which to discern a confidential relationship. *See id.*

*Owens*, 847 A.2d at 710.

The presence of a power-of-attorney is a factor but

not conclusive in determining whether a confidential relationship exists. In *Foster v. Schmitt*, 239 A.2d 471, 474 (Pa. 1968), the court stated:

> [I]f there be any clearer indicia of a confidential relationship than the giving by one person to another of a power of attorney over the former's entire life savings, this Court has yet to see such indicia.

Still,

> the mere fact a person holds a power of attorney does not establish a prima facie case of a confidential relationship with the donor of the power. Instead, the proponents assert, the underlying facts must be examined to see if there was any overmastering influence. Thus, in [Estate of] Ziel the Pennsylvania Supreme Court observed that while "no clearer indication of a confidential relationship could exist than giving another person the power of attorney over one's life savings," on the facts of Ziel a power of attorney did not evidence a confidential relationship where the testator was active in handling his business affairs and "the contestant's evidence does not demonstrate convincingly that" the testator "was subject to any overmastering influence." [Estate of] Ziel, 467 Pa. at 542-43, 359 A.2d at 734.

*Estate of Marie Lista*, 2006 WL 321189 at *9.

Decedent's grant of a general power-of-attorney to Lawrence is not critical to our decision on this element. The power-of-attorney is dated the same date as decedent's will, August 3, 2006, shortly after decedent was diagnosed with mild dementia. It names both Lawrence and Michael as agents with authority to act on decedent's behalf and

was clearly part of decedent's end of life planning in which both his sons were being treated equally. We do not believe the giving of a power-of-attorney to the natural objects of one's bounty under these circumstances signifies a confidential relationship.

Far more important is the relationship which existed between decedent and Lawrence during the next three years. Lawrence attended many, if not most, of decedent's appointments with Dr. Kaplan. He was present and must have observed the same decline in decedent's mental and physical health as was observed by Dr. Kaplan, yet when Lawrence described decedent's mental status to Sacred Heart for purposes of evaluating the level of care decedent required, he inexplicitly stated that decedent was "very with it." (Petitioner exhibit no. 12). Moreover, Lawrence not only insisted, he demanded, that decedent be placed in independent living.

The decision for decedent to move to Pennsylvania and to be closer to his family was a logical one. Decedent no longer had any close relatives in New York. Lawrence and his son, Jason, were the only ones who visited decedent at Peconic Landing. Michael appears to have been either unable or unwilling to visit; in any event, he didn't. Nevertheless, once the decision to move was made, the level of confidence decedent placed in Lawrence to find him a new home was evident. Decedent told Lawrence, "If you like it, I will do it. I am going to leave it to you. If you like, I will do it." (N.T. 7/12/12, p.245).

When decedent was being physically admitted at Sacred Heart and assessed by Tatiana Gula, Lawrence was with him. Decedent's dependence on Lawrence, as

described by Ms. Gula, has already been discussed. While at Sacred Heart, Lawrence frequently visited decedent, and decedent's reliance on Lawrence was obvious and visible. In this respect, Ms. Gula testified to multiple occasions when she would see Decedent sitting by himself with nothing to do, waiting for Lawrence to arrive, and asking where Lawrence was and when he would be coming. (N.T. 4/23/12, pp.140-41, 170). Decedent further depended on Lawrence not only to take him to his doctor appointments but to be there and speak on his behalf and provide the information requested by medical providers.

In describing Lawrence's concern and care for decedent, we are not being critical or suggesting that Lawrence acted wrongly. Decedent was frail and his mental faculties were declining; he needed help; and he needed someone to trust. Decedent had nowhere else to go and Lawrence was there to help. Under the circumstances, it was natural for decedent to turn to Lawrence, to rely upon him, and to place his trust in him; and he did.

*(b) Substantial Benefit*

As to this element,

"Substantial benefit" has not been specifically defined by Pennsylvania courts, and whether one receives a substantial benefit is determined on a case-by-case basis. *In re Estate of LeVin*, 419 Pa. Super. 89, 615 A.2d 38, 41-42 (1992), *appeal denied*, 534 Pa. 639, 626 A.2d 1158 (1993) (citing *In re Adams' Estate*, 220 Pa. 531, 69 A. 989, 990 (1908)).

*Estate of Fritts*, 906 A.2d at 609.

In the instant case, however, we believe no two

reasonable persons would disagree that a substantial benefit was conferred on Lawrence by the change of beneficiary. Not only has his share of decedent's investment accounts increased from half to a hundred percent of $2,315,362.48, the balance of decedent's assets as represented by his probate estate, separate and apart from these investments, is less than $10,000.00.

### c. Weakened Intellect

This element too has been the subject of much discussion in our case law.

> "Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." *Owens, supra* at 707 (citing *In re Estate of Glover*, 447 Pa. Super. 509, 669 A.2d 1011, 1015 (1996), *appeal denied*, 547 Pa. 728, 689 A.2d 233 (1997)). In a case of undue influence, a trial court has greater latitude to consider medical testimony describing a decedent's condition at a time remote from the date that the contested will was executed.

*Estate of Fritts*, 906 A.2d at 607. What is certain is that "[f]or purposes of the undue influence test, weakened intellect does not rise to the level of testamentary incapacity." *Estate of Angle*, 777 A.2d at 123. It is also clear that weakened intellect in an undue influence case is a relative concept.

> The closest we can come therefore to a definition of weakened intellect is that it is a mind which, in all the circumstances of a particular situation, is inferior to normal minds in reasoning power, factual

knowledge, freedom of thought and decision, and other characteristics of a fully competent mentality. It should be viewed essentially as a relative state as the term is applied to cases of undue influence, as these cases always involve the effect of one intellect upon another.

*Estate of Marie Lista*, 2006 WL 321189 at *11, (quoting *Heffner Will*, 19 Fid.Rep. 542, 546-57 (Mont.Cty.OC. 1969)).

This issue was more fully discussed under testamentary capacity. In brief, in 2006 Dr. Gatewood diagnosed decedent with dementia. Dr. Kaplan testified that decedent's mental faculties had declined substantially in the time he was at Peconic Landing, particularly the last two years, and was obvious. (Petitioner exhibit no. 31 (Kaplan deposition), pp.74-76, 103). Both Drs. Gatewood and Kaplan testified that their practices deal primarily with the elderly and that they have vast experience in treating this population. Both testified they can distinguish between inappropriate or incomplete responses caused by hearing loss and those attributable to a cognitive disability, and that both were aware of the severity of decedent's hearing loss and accounted for it in their evaluations. Both of these physicians personally examined and treated decedent, and both were in the best position to diagnose whether Decedent had a weakened intellect.

Dr. Barry Rovner culled decedent's medical records and reviewed the testimony of various witnesses and opined, after this review, that decedent had dementia which was progressive and incurable, and which affected decedent's medical processes and cognitive abilities, and impaired his decision-making capacity. (N.T. 7/10/12,

p.30).[10]

Based on these findings, a presumption of undue influence exists, with the burden on Lawrence to rebut.

### 3. Undue Influence — Rebutting the Presumption

This is a difficult case both because of what we know and what we don't know. We know decedent suffered from failing health and progressive dementia between his 2006 hospitalization at Eastern Long Island Hospital and his death, that he looked to and relied heavily upon his son Lawrence in the final years of his life, placing complete faith and trust in his oldest child, and that he changed the beneficiary of his Vanguard accounts - the bulk of his estate — slightly more than one year before his death, removing Michael and making Lawrence the sole beneficiary. From these facts alone, a presumption of undue influence is raised under the three-part test set forth in Estate of Clark, 334 A.2d at 631-32. Importantly, this presumption is based upon circumstantial evidence. No direct evidence was presented of undue influence or that Lawrence bore down and, in fact, exercised an overmastering influence on decedent for financial gain.

We know also, even before decedent's admission to Peconic Landing, that Lawrence routinely spent time with his father throughout the year while Michael would

---

10. Dr. Anthony Giampolo testified that the medical records did not support a clinical diagnosis of dementia but, in each instance where confusion, memory loss or disorientation was reported, was better characterized as being caused by acute delirium — an impairment of cognition due to some external factor such as infection, fever or overmedication. (N.T. 7/10/12, pp.77-78; N.T. 7/12/12, pp.52-54, 72, 133, 156). Given the duration and progression of decedent's declining cognitive faculties, and the explanations provided by Drs. Gatewood, Kaplan and Rovner, we are not persuaded by Dr. Giampolo's testimony.

spend a few hours with decedent when he happened to be in the area transporting a boat (N.T. 4/23/12, p.38), and that Lawrence's son maintained regular contact and had an on-going relationship with decedent, whereas we don't know if decedent ever met Michael's children and, if he did, when was the last time he saw them. (N.T. 7/12/12, pp.200-01).

We know that in 2001 decedent titled his home in both of his sons' names, and that in 2007 the home was sold and each son received $120,000.00, but we don't know whether Michael ever expressed any gratitude for this gift. We know that decedent was diagnosed with dementia in 2006 and admitted to Peconic Landing because of his declining ability to care for himself and that Lawrence was the one who came to see him and assisted him in this transition. We know that Lawrence was the only one of his sons who visited him while he was at Peconic Landing and that, in December 2008 he asked to move closer to Lawrence and that Lawrence assisted him with this move.

We know that Lawrence routinely visited his father at Sacred Heart, that he took him to all his medical appointments (N.T. 7/12/12, p.209), that he visited him in the hospital for at least two hospitalizations and was close by when his father died. And we know that Michael didn't visit his father once for more than six years before his death even though he knew his father was in failing health, was in assisted living, was forgetful and getting worse, and was hospitalized twice for falling and breaking his hip in the last two years of his life. Nor did Michael have the time to attend his father's funeral services. (Petitioner exhibit no. 33 (Lawrence's deposition), p.17).

Of course we don't know, for sure, why decedent changed the beneficiary of his Vanguard accounts, but we don't have to guess. There were two sons. One was there when decedent needed him. One wasn't. And this made all the difference.

This was not a spur of the moment decision. It was a difficult decision, one which required serious thought, and one which the decedent chose not to discuss at length with others or to explain his reasons.[11] So while the effect of the change made in the beneficiary of decedent's Vanguard accounts is belied by the simplicity with which it was made, the reason for the change was years in the making — at least five years.

The "concept of undue influence is predicated on the assumption that the influence of a strong and predatory character close to the testator who is possessed of a weakened mental state will prey insidiously on the weakened intellect in order to extract testamentary benefactions that would not otherwise be forthcoming." *Estate of Ziel*, 359 at 734-35. This is not what happened here.

---

11. In a revealing moment in July 2010, while Lawrence was returning his father to Sacred Heart from Lehigh Valley Hospital, decedent told Lawrence of the change. The conversation was short. As testified to by Lawrence, as they were leaving the hospital, out of the blue, decedent said "I took Michael off my Vanguard and put on your son." Lawrence asked his father if he was sure he wanted to do this and decedent said, "That is up to me." (N.T. 7/12/12, pp.281-82, 325-31).

Lawrence knew what was at stake. (N.T. 7/12/12, p.328). Should he have done more to change his father's mind. In a better world, the answer is obvious. But clearly the law does not require this.

It's a conversation Lawrence will have to live with for the rest of his life. It is also a conversation Lawrence never had to reveal. It's a conversation that we believe occurred. And it's a conversation that says so much more than what was said.

The presumption of undue influence raised under *Estate of Clark* is not irrebuttable. Stated differently, not every child who is entrusted with the care of an elderly parent of diminished mental capacity and upon whom is bestowed a substantial benefit by that parent has exerted undue influence. It happens all the time, and it happened here.

> It is important not to penalize or stigmatize the person who assists an ill and dying person in her last days. As the Pennsylvania Supreme Court observed: "What offends against an innate sense of justice, decency and fair play offends against good law. And if a testatrix rewards a benefactress who cared for her when her need was great and others passed her by, the courts will not find her bequest offending against nature or law." *King Will*, 369 Pa. at 531-32, 87 A.2d at 474.

*Estate of Marie Lista*, 2006 WL 321189 at *13.

## CONCLUSION

In denying Michael's Petition, in toto, we do not do so lightly. For good reason the law requires strict proof, clear and convincing evidence, before a testamentary gift can be set aside on the basis of incapacity or undue influence. Our decision respects this burden, comprehends the nature of the presumption of undue influence as an evidentiary shortcut and only that, and, we believe, honors decedent's intentions.